

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| METABANK,<br><br>Plaintiff,<br><br>vs.<br><br>INTERSTATE COMMODITIES, INC.,<br><br>Defendant. | 3:16-CV-03007-RAL<br><br><br>OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff MetaBank sued Defendant Interstate Commodities, Inc., (ICI) for conversion, breach of subordination agreement and declaratory judgment. Doc. 1. After the discovery deadline passed, both MetaBank and ICI filed motions for summary judgment. Docs. 23, 30. MetaBank also filed a motion to compel answers to discovery requests. Doc. 45. The cross motions for summary judgment present a legal question—the construction of a written subordination agreement between MetaBank and ICI. This Court held oral argument on the cross motions for summary judgment on October 26, 2017. For the reasons explained, this Court grants MetaBank's Motion for Summary Judgment, denies ICI's Motion for Summary Judgment, and denies MetaBank's Motion to Compel as moot.

I.   **Material Facts Not Subject to Genuine Dispute**

MetaBank is a federally chartered thrift with places of business in South Dakota and elsewhere. Doc. 25 at ¶ 1; Doc. 40 at ¶ 1. ICI is a New York corporation with sufficient minimum contacts to the state of South Dakota through ownership during the relevant time of

1

grain elevators in South Dakota and with certain business arrangements with South Dakota farmers, including with the MetaBank customer whose loan defaults led to this lawsuit. Doc. 25 at ¶¶ 2–3; Doc. 40 at ¶¶ 2–3. This Court has diversity jurisdiction under 28 U.S.C. § 1332, because the parties are from different states and more than the requisite jurisdictional amount is at issue.

MetaBank provides personal, mortgage, business and agricultural loans and lines of credit as a part of its banking business. Doc. 32 at ¶ 5; Doc. 37 at ¶ 5. MetaBank extended agricultural financing to a Minnesota entity called C&B Farms, LLC (C&B Farms) during 2014 and into early 2015. Doc. 25 at ¶¶ 5, 13; Doc. 40 at ¶¶ 5, 13. C&B Farms was a large farming operation, raising crops in South Dakota and Minnesota in 2014 and 2015. Doc. 25 at ¶ 8; Doc. 40 at ¶ 8. MetaBank's loans to C&B Farms were secured by a blanket lien on all of the personal property of that entity, including farm products. Doc. 25 at ¶ 9; Doc. 40 at ¶ 9. In order to perfect its security interest, MetaBank filed a UCC-1 financing statement with the Minnesota Secretary of State and also filed an effective financing statement in Minnesota and South Dakota to place buyers of farm products from C&B Farms on notice of MetaBank's lien. Doc. 25 at ¶ 10; Doc. 40 at ¶ 10. Accordingly, MetaBank had a perfected first position lien in C&B Farms' 2014 and 2015 crops. Doc. 25 at ¶ 11; Doc. 40 at ¶ 11.

Following completion of the 2014 farming season, C&B Farms failed to repay the indebtedness owed to MetaBank in full when it was due. Doc. 25 at ¶ 12; Doc. 40 at ¶ 12. In late 2014 and early 2015, MetaBank advanced funds for C&B Farms to pay for expenses for the 2015 crop year; such advances ended in March of 2015. Doc. 25 at ¶ 13; Doc. 40 at ¶ 13. In early 2015, MetaBank informed C&B Farms that it would need to provide additional collateral in order to obtain additional funding from MetaBank to cover C&B Farms' remaining input

financing needs for the 2015 crop year, but C&B Farms declined to do so and pursued alternative financing. Doc. 25 at ¶ 14; Doc. 40 at ¶ 14.

For help with its 2015 operations and financing, C&B Farms turned to Travis Sitter, an agricultural consultant based in South Dakota who assists farming entities like C&B Farms with budgeting, grain marketing and obtaining crop insurance and financing. Doc. 25 at ¶ 18; Doc. 40 at ¶ 18. Sitter on behalf of other agricultural clients had worked with ICI on what ICI calls "advance purchase contracts," under which farmers receive advances of funds from ICI in exchange for ICI later receiving the farmer's crops under grain purchase contracts together with a percentage of the farmer's profits. Doc. 40 at ¶ 15–20; Doc. 25 at ¶ 15–20. Sitter spoke with ICI about funding C&B Farms for crop year 2015 under the advance purchase contracts program.

ICI performed a UCC search on C&B Farms and determined that MetaBank had a lien on crops grown by C&B Farms and proceeds therefrom. Doc. 25 at ¶ 21; Doc. 26-1 at 5. Having identified MetaBank's lien filings, ICI determined that it should obtain a subordination agreement from MetaBank before any further advances to C&B Farms. Doc. 25 at ¶ 22; Doc. 26-1 at 5; Doc. 26-2 at 3; Doc. 40 at ¶¶ 21–22. ICI told Sitter, who was working as C&B Farms' consultant, that a subordination from MetaBank was necessary if ICI was going to advance further funds to C&B Farms. Doc. 25 at ¶ 23; Doc. 40 at ¶ 23.

Sitter approached MetaBank to seek a subordination agreement in favor of ICI. Doc. 25 at ¶ 24; Doc. 26-2 at 3; Doc. 40 at ¶ 24. MetaBank reviewed a draft of C&B Farms' December 31, 2014 financial statement showing prepaid expenses of $543,000, and an account history from January to March 15, 2015, showing transactions in C&B Farms' MetaBank account of $377,000. Doc. 25 at ¶ 25; Doc. 40 at ¶ 25. Based on these figures, which did not necessarily

reflect actual prepaid expenses in the 2015 crop year, MetaBank issued a letter dated May 11, 2015, stating the following:

> As communicated verbally in April, MetaBank agrees to release/subordinate 2015 crop proceeds to your current finance provider upon receipt/reimbursement of 2015 crop expenses funded by MetaBank's existing line of credit to C&B Farms LLC.
>
> I am enclosing the amount we determined by reviewing the 12/13/14 Financial Statement and review of accounts after that date and funded by the line of credit.
>
> That amount comes to: $920,000
>
> Let this letter serve as notice that MetaBank will release/subordinate 2015 crop proceeds upon receipt of this amount.
>
> Please provide additional information if you feel this amount is not accurate.

Doc. 26-4; Doc. 40 at ¶¶ 25–26. Communications occurred between Sitter and MetaBank where Sitter requested that MetaBank issue a subordination letter with an amount of "$326K ish." Doc. 39-10; Doc. 40 at ¶ 27. MetaBank's correspondence indicated that it lacked confidence that $920,000 was the right number, but was concerned that Sitter proposed an amount $600,000 less than what MetaBank expected C&B Farms to have invested in the 2015 growing season. Doc. 39-9; Doc. 40 at ¶ 27.

Sitter then provided MetaBank with information from C&B Farms' bookkeeper Holly Schmitz that C&B Farms had paid $501,000 for land rent for 2015, and from C&B Farms' outside accountant who believed that C&B Farms had paid $324,784.57 toward 2015 expenses. Doc. 25 at ¶ 28. MetaBank relied on and combined these figures to revise the $920,000 number in the May 11 letter down to $825,784.57. MetaBank issued a subordination letter[1] dated May 21, 2015—the critical subordination agreement to this dispute—stating:

---

[1] This letter was addressed to ICI and C&B Farms. The letter could be viewed as an offer, akin to and nearly identical to the May 11 letter, with acceptance by ICI of the May 21 offer through ICI's detrimental reliance through extending additional financing to C&B Farms. Both parties refer to the

4

> As communicated verbally in April, MetaBank agrees to release/subordinate 2015 crop proceeds to your current finance provider upon receipt/reimbursement of 2015 crop expenses funded by MetaBank's existing line of credit to C&B Farms LLC.
>
> I am enclosing the amount we determined by reviewing the 12/13/14 Financial Statement, review of accounts after that date and funded by the line of credit, and quick book transactions provided.
>
> That amount comes to:   $825,784.57
>
> Let this letter serve as notice that MetaBank will release/subordinate 2015 crop proceeds upon receipt of this amount.
>
> Please provide additional information if you feel this amount is not accurate.

Doc. 26-5.

ICI received the subordination letter and relied on it to advance additional funds to C&B Farms thereafter. Doc. 25 at ¶¶ 40–41; Doc. 40 at ¶¶ 40–41. ICI has received payments from C&B Farms or from the sale of its 2015 crops, but has not been repaid by C&B Farms for all that it advanced to C&B Farms. During the summer and fall of 2015, MetaBank received four payments from C&B Farms' 2015 crop proceeds totaling $345,270.32. Doc. 25 at ¶ 42; Doc. 40 at ¶ 42.

ICI initially contemplated that MetaBank would receive the first $825,784.57 from crop sales as set forth in the May 21 subordination letter, and initially had no reason to question that C&B Farms had spent that amount from MetaBank loans for its 2015 expenses. Doc. 25 at ¶ 45; Doc. 26-1 at 7; Doc. 26-7; Doc. 40 at ¶ 45. The budget upon which ICI was working to determine what it would be willing to advance to C&B Farms in 2015 included the full amount of $825,784.57 contained in the subordination letter. Doc. 25 at ¶ 45; Doc. 26-7; Doc. 40 at ¶ 45. C&B Farms sought to obtain additional advances from ICI late in the 2015 crop year, but

---

May 21 letter as an agreement. This letter is no model for a subordination agreement and surprisingly casual for the two rather sophisticated litigants in this case.

5

ICI determined that C&B Farms had reached the maximum amount that ICI was willing to advance. Doc. 25 at ¶ 44; Doc. 26-7; Doc. 40 at ¶ 44. While attempting to obtain more money from ICI, C&B Farms in August of 2015 told ICI that the money C&B Farms paid for its 2015 expenses out of MetaBank loans was less than the $825,784.57 contained in the MetaBank subordination agreement. Doc. 25 at ¶ 46; Doc. 40 at ¶ 46. After learning that C&B Farms had apparently used a lesser amount of MetaBank's money for its 2015 expenses, ICI did not initially take a different position on how much MetaBank should receive; certain communications by ICI appear to affirm the subordination letter and an ICI representative affirmed during a September 28, 2015 call with MetaBank's counsel that ICI would pay the full amount listed in the subordination letter before ICI took any proceeds from C&B Farms' 2015 crop. Doc. 25 at ¶¶ 47–48; Doc. 26-1 at 8; Doc. 26-6.

C&B Farms' 2015 crop year was not a financial success. Doc. 25 at ¶ 49; Doc. 40 at ¶ 49. ICI purchased grain from C&B Farms that was worth in excess of $825,784.57, but is taking the position that it is not required to submit any additional proceeds to MetaBank from the 2015 crop. Doc. 25 at ¶ 51; Doc. 40 at ¶ 51. MetaBank's loans to C&B Farms exceeded $825,784.57, and indeed MetaBank has obtained judgment against C&B Farms in the amount of $2,492,006.95. Doc. 25 at ¶ 50; Doc. 40 at ¶ 50.

MetaBank has sued ICI for $480,514.25, which is calculated as the difference between $825,784.57 (the number contained in the May 21 subordination agreement) and the actual amount Metabank received from C&B Farms' 2015 crop year of $345,270.32. Doc. 1. MetaBank seeks prejudgment interest as well. Doc. 1. ICI, relying on C&B Farms' accountant's analysis, maintains that only $324,213.80 of MetaBank's financing to C&B Farms went toward

2015 expenses, and contends that MetaBank is entitled to no further funds. ICI separately has sued C&B Farms and others for the amounts that C&B Farms failed to repay to ICI.[2]

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). On summary judgment, the facts and inferences drawn from those facts must be viewed in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curium). For purposes of this Opinion and Order, the issues of facts are viewed in the light most favorable to ICI. Undisputed facts must be presented by citing to materials in the record, including depositions, affidavits, and other sworn or certified evidence, and the parties usually cannot rely on the pleadings alone. Fed. R. Civ. P. 56(c)(1), (e); Celotex Corp., 477 U.S. at 324. "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (quoting Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995)). "A mere scintilla of evidence is

---

[2] ICI has sued C&B Farms, an affiliated entity, Sitter and another bank in the Northern Division of the District of South Dakota alleging claims of breach of contract, negligent misrepresentation, fraudulent misrepresentation, fraudulent concealment, deceptive trade practices and unjust enrichment against C&B Farms. Interstate Commodities, Inc. v. C&B Farms LLL, et al., 17-CV-1018-CBK. Doc. 1.

7

insufficient to avoid summary judgment;" the evidence must be "significantly probative" in establishing a genuine issue of material fact to avoid summary judgment. Moody v. St. Charles Cty., 23 F.3d 1410, 1412 (8th Cir. 1994).

**B. Subordination Agreement**

The parties agreed that the MetaBank letter dated May 21, 2015, is a subordination agreement binding on these parties. MetaBank was in a first secured lien position, with a security interest in the 2015 growing crops of C&B Farms. ICI had notice of MetaBank's position, sought out through C&B Farms' consultant Sitter a subordination agreement before ICI would extend further financing to C&B Farms, received the subordination agreement, and relied upon it in advancing further funds to C&B Farms.

A secured creditor of course has a claim for conversion against a third party with an inferior interest in collateral who takes or sells that collateral. SDCL § 57A-9-315, see UCC § 9-315, comment 2; Rushmore State Bank v. Kuryles, Inc., 424 N.W.2d 649, 659 (SD 1988); Aberdeen Prod. Credit Ass'n v. Redfield Livestock Auction, Inc., 379 N.W.2d 829, 830 (SD 1985). A subordination agreement creates an affirmative defense, entitling a junior creditor to a defense against a conversion action by a senior creditor who has been subordinated. See, e.g., Rushmore State Bank, 424 N.W.2d at 659. A secured creditor also has a breach of contract claim when a party to a subordination agreement breaches the agreement. See General Elec. Capital Corp. v. Union Planters Bank, N.A., 409 F.3d 1049, 1053–59 (8th Cir. 2005) (vacating district court's grant of summary judgment on claims based in part on breach of a subordination agreement and conversion); Agriliance, L.L.C. v. Farmpro Serv., Inc., 328 F. Supp. 2d 958, 968 (S.D. Iowa 2003) (granting summary judgment on breach of contract claim where defendant breached the subordination agreement).

8

Both MetaBank and ICI assert that the May 21 subordination agreement is unambiguous and seek summary judgment based on the letter. However, MetaBank and ICI have very differing interpretations of the letter. ICI concentrates on the first sentence of the letter only, to argue that MetaBank is restricted to receive only those portions of MetaBank's loans that C&B Farms actually used for 2015 crop expenses. MetaBank, by contrast, points to the number of $825,784.57 recorded in the body of the letter and the sentence immediately thereafter that "MetaBank will release/subordinate 2015 crop proceeds upon receipt of this amount." See Doc. 26-5.

Both parties recognize that South Dakota law governs this diversity jurisdiction case. Contract interpretation is a question of law for the court. Estate of Lien v. Pete Lien & Sons, Inc., 740 N.W.2d 115, 119 (S.D. 2007). Subordination agreements are construed like any other contract. See In re Exec Tech Partners, 107 F.3d 677, 681 (8th Cir. 1997); In re Sepco, Inc., 36 B.R. 279, 285 (Bankr. D.S.D. 1984), aff'd 750 F.2d 51 (8th Cir. 1984); SDCL § 57A-9-339. An ambiguity exists only when a contract "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Vander Heide v. Boke Ranch, Inc., 736 N.W.2d 824, 836 (S.D. 2007); see also, Vandyke v. Choi, 888 N.W.2d 557, 565 (S.D. 2016) ("A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct.") (internal citations omitted). When there is no ambiguity, the intent of the parties is to be derived only "from the four corners of the contract." Black Hills Excavating Serv. Inc., v. Retail Const. Serv. Inc., 877 N.W. 2d 318, 322 (S.D. 2016) (citing Vander Heide, 736 N.W.2d at 835) Ambiguities do not exist "simply because the parties do not agree on [the contract's] proper construction or their intent upon executing the contract." Id.

To interpret a written contract, the Court must consider the contract as a whole. Nygaard v. Sioux Valley Hosp. & Health Sys., 731 N.W.2d 184, 191 (S.D. 2007). Doing so here reveals that MetaBank's interpretation is correct. This agreement is quite short; the full text is the following:

> As communicated verbally in April, MetaBank agrees to release/subordinate 2015 crop proceeds to your current finance provider upon receipt/reimbursement of 2015 crop expenses funded by MetaBank's existing line of credit to C&B Farms LLC.
>
> I am enclosing the amount we determined by reviewing the 12/31/14 Financial Statement, review of accounts after that date and funded by the line of credit, and quick book transactions provided.
>
> That amount comes to: $825,784.57
>
> Let this letter serve as notice that MetaBank will release/subordinate 2015 crop proceeds upon receipt of this amount.
>
> Please provided additional information if you feel this amount is not accurate.

Doc. 26-5. The first sentence of the letter confirms a communication during April of 2015 about the willingness of MetaBank to subordinate part of its first priority position upon fulfillment of conditions. The rest of the letter describes the conditions. The letter expressly states that the amount MetaBank calculated as 2015 crop expenses of C&B Farms funded by MetaBank's line of credit to be $825,784.57, and then states that "MetaBank will release/subordinate 2015 crop proceeds upon receipt of this amount." Doc. 26-5. There is no ambiguity in the text of the letter. ICI's interpretation of the letter would read out of existence not only the amount of $825,784.57, but also the next sentence stating that MetaBank would "release/subordinate 2015 crop proceeds *upon receipt of this amount.*" Doc. 26-5 (italics added). The letter, when considered as a whole, cannot be read to mean that the amount to be paid to MetaBank would be negotiated later or

hinge upon what ICI and C&B Farms later determined to be the actual amount that C&B Farms spent from MetaBank's money for 2015 crop expenses.

ICI then argues that there was a mutual mistake of fact, in that $825,784.57 was not in fact the actual amount that C&B Farms had applied to 2015 crop expenses out of MetaBank's loans. Construing the facts in the light most favorable to ICI, C&B Farms did not in fact expend $825,784.57 of MetaBank's loans to pay for 2015 crop expenses, but perhaps expended as little as approximately $324,000 of that amount, notwithstanding the information or misinformation supplied by C&B Farms' bookkeeper and accountant in May of 2015. ICI's argument thus has some factual appeal, but no legal support for the outcome ICI urges.

The Supreme Court of South Dakota has recognized mutual mistake of fact as a legal basis for rescission of a contract. Knudsen v. Jensen, 521 N.W.2d 415, 417–19 (S.D. 1994); Carnicle v. Swann, 314 N.W.2d 311, 312–13 (S.D. 1982). SDCL § 53-4-9 defines a mistake of fact:

> [A] mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:
> (1) An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or
> (2) Belief in the present existence of a thing material to the contract which does not exist, or in the past existence of such a thing which had not existed.

SDCL § 53-4-9. The Supreme Court of South Dakota has interpreted this definition as follows:

> The fact concerning which the mistake was made must be material to the transaction and must not result from the want of such care and diligence as would be exercised by a person of reasonable prudence under the same circumstances and must relate either to a present or past fact.

LPN Trust v. Farrar Outdoor Advert., Inc., 552 N.W.2d 796, 800 (S.D. 1996) (quoting Nilsson v. Krueger, 9 N.W.2d 783, 786 (S.D. 1943)). Further, the mistake must have a material effect on the contract, which means that the mistake "must be so fundamental in character that because of

11

it the minds of the parties did not meet." Knudsen, 521 N.W.2d at 418 (quoting Beatty v. Depue, 103 N.W.2d 187, 191 (S.D. 1960)); see also Schumacher v. Tyson Fresh Meats, Inc., 434 F. Supp. 2d 748, 754 (D.S.D 2006) ("[u]nder South Dakota law, where there has been a mutual mistake of fact, no contract results because there is no meeting of the minds.") (internal quotations omitted). That is, "but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved." Beatty, 103 N.W.2d at 191–92 (quoting Grymes v. Sanders, 93 U.S. 55, 60 (1876)). A mutual mistake of fact to warrant rescission is restricted to instances "where the evidence is clear and convincing." Vermailyea v. BDL Enterprises, Inc., 462 N.W.2d 885, 888 (S.D. 1990).

South Dakota authority recognizes rescission of a contract for mutual mistake of fact, and the Restatement (Second) of Contracts from which South Dakota courts have drawn guidance on the doctrine of mistake likewise recognizes that a material mistake of fact renders the contract voidable. Restatement (Second) of Contracts § 152; see Knudsen, 521 N.W.2d at 418 n.2 (citing and quoting Restatement (Second) of Contracts § 152). ICI however does not seek to have the subordination agreement voided or rescinded. Indeed, voiding or rescinding the subordination agreement would put MetaBank in the position of having a lien on all of C&B Farms' 2015 crops and not just the first $825,784.57 derived from the 2015 crop sales of C&B Farms. Rather, ICI invokes the doctrine of mutual mistake of fact to have this Court revise and rewrite the subordination agreement to delete the $825,784.57 amount and apparently to substitute the amount MetaBank actually received—$345,270.32—into the subordination agreement, or to excise all but the first sentence of the agreement. ICI cites no South Dakota law permitting a court to do so, and this Court has found no South Dakota statutes or cases authorizing a court to rewrite an agreement like this one under these circumstances.

12

Indeed doing so would be unjust. MetaBank has a deficiency judgment against C&B Farms for over $2 million, so there is no question or mistake that MetaBank had loaned well in excess of $825,784.57 to C&B Farms by March of 2015. MetaBank itself in May of 2015 had calculated, albeit without confidence, that $920,000 of what it had loaned to C&B Farms may have been applied to the 2015 crop expenses. Doc. 26-4. When Sitter on behalf of C&B Farms countered proposing subordination upon receipt of "$326K ish," MetaBank responded that such a number was as much as $600,000 too low.[3] Doc. 39-9; Doc. 39-10; Doc. 40 at ¶ 27. MetaBank then revised its subordination letter to subordinate its interests after receiving $825,784.57 from C&B Farms' 2015 crop sales. Neither C&B Farms nor ICI contested that $825,784.57 amount until it was apparent that C&B Farms' 2015 crop year was disappointing and that there would not be enough money to go around.[4] Both parties initially understood the subordination agreement to require payment to MetaBank of $825,784.57 before its interest in C&B Farms' 2015 crops would be subordinated. ICI has failed to present evidence to the contrary; certainly far short of the necessary clear and convincing standard required to invoke the doctrine of mutual mistake of fact. See Vermilyea, 462 N.W.2d at 888.

Moreover, ICI seeks a remedy which mutual mistake cannot offer. Mutual mistake of fact results in contract rescission because the parties failed to reach a "meeting of the minds," thus no contract was formed in the first place. Schumacher, 434 F. Supp. 2d at 754. If in fact there had been no meeting of the minds here, it would be beyond the power of this Court to alter

---

[3] MetaBank argued at the motion hearing that if it had known that so little of the line of credit had gone to C&B Farms' 2015 expenses as of May of 2015, MetaBank may have pursued other remedies, such as immediate foreclosure.

[4] Indeed, for ICI to now claim that it relied on MetaBank's representations as to the amount applied to 2015 crop year expenses after relying on Sitter to engage in this back-and-forth that resulted in a revised subordination agreement of $825,784.57 down from $920,000 makes application of the doctrine of mutual mistake even less appropriate. The mistake "must not result from the want of such care and diligence as would be exercised by a person of reasonable prudence under the same circumstances" for the doctrine to apply. LPN Trust, 552 N.W.2d at 800.

a contract which in effect would never have existed.[5] These circumstances do not justify using the doctrine of mutual mistake of fact to change the listed number of $825,784.57 to $345,270.32 or to delete or ignore the final four sentences of the five-sentence agreement.

Because ICI breached the subordination agreement, MetaBank can recover for breach of contract. General Elec. Capital Corp., 409 F.3d at 1053–59; Agriliance, L.L.C., 328 F. Supp. 2d at 968. Because ICI in turn converted collateral in which MetaBank had a first secured position, ICI also committed the tort of conversion. Rushmore State Bank, 424 N.W.2d at 659; Aberdeen Prod. Credit Ass'n, 379 N.W.2d at 830.

### C. SDCL § 57A-9-609.1

ICI argues that it remains entitled to summary judgment and that MetaBank may not recover anything from ICI based on SDCL § 57A-9-609.1. That statute, unique to South Dakota, states:

> No cause of action for recovery of security or its value may be commenced by a secured creditor against an innocent third-party purchaser of farm products as defined in subsection (34) of § 57A-9-102, nor may such a cause of action be commenced against a livestock auction agency, as defined in chapter 40-15 and

---

[5] ICI essentially asks this Court to reform the subordination agreement to give it a meaning ICI desires. However, reformation is an appropriate remedy only when both parties have made a mistake as to the written expression of an agreement. The Restatement (Second) of Contracts explains this principle:

> The province of reformation is to make a writing express the agreement that the parties intended it should. Under the rule stated in this Section, reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. *Their mistake is one as to expression*—one that relates to the contents or effect of the writing that is intended to express their agreement—and the appropriate remedy is reformation of that writing properly to reflect their agreement.

See Restatement (Second) of Contracts § 155 (italics added). ICI cannot credibly claim that the parties intended the amount MetaBank required to subordinate its interests in C&B Farms' 2015 crops to be $345,270.32 or $324,000 or $326,000 or some amount to be determined at a later date. If there had been a mutual mistake of fact present here, rescission would be the appropriate remedy, not reformation.

14

§ 301 of the Packers and Stockyards Act (7 U.S.C. 201), or a public grain warehouse, or a public terminal grain warehouse, or a grain dealer as defined by chapters 49-43, 49-44, and 49-45 respectively, unless such action is commenced within twenty-four months from the date the farm products are sold and unless such action is preceded by the secured creditor offering to file against the debtor, a complaint as defined by § 23A-2-1.

SDCL §57A-9-609.1. MetaBank certainly qualifies as a "secured creditor," and MetaBank did not offer to file against the debtor (C&B Farms) a criminal complaint, which is what is referenced in SDCL § 23A-2-1. ICI argues that it is either "an innocent third-party purchaser of farm products" or a "grain dealer" under the statute, such that it is insulated from any cause of action by MetaBank "for recovery of security or its value."

Under South Dakota law, a court engaged in statutory interpretation is to "give words their plain meaning and effect, and read statutes as a whole." Expungement of Oliver, 810 N.W.2d 350, 352 (S.D. 2012). "A fundamental rule of statutory construction is that the intention of the law is to be primarily ascertained from the language expressed in the statute." Fin-Ag, Inc. v. Pipestone Livestock Auction Mkt, Inc., 754 N.W.2d 29, 37 (S.D. 2008). Courts must avoid the addition of modifying words or changes to the terms of a statute "under the guise of judicial construction." Id. at 38.

SDCL § 57A-9-609.1 is a curiously worded statute that has been the subject of just one prior published decision,[6] but it cannot be interpreted as ICI urges. First, although ICI operates

---

[6] The only decision this Court has found regarding interpretation of this statute is Fin-Ag, Inc. v. Pipestone Livestock Auction Market, Inc., 754 N.W.2d 29 (S.D. 2008). In Fin-Ag, a lender had a security interest in cattle of borrowers, but the borrowers used an assumed name of C&M Dairy to sell their cattle at two different sales barns. The sales barns argued that the lender had failed to meet the statutory requirements of SDCL § 57A-9-601.1 by not informing a South Dakota State's Attorney, the South Dakota Attorney General, or a law enforcement agency of their offer to file a criminal complaint, and thus could not be held liable in a conversion action. Id. at 37. In a fairly fractured opinion, Justice Zinter rejected this interpretation, holding that the statute's language did not impose such an additional step on a plaintiff bringing a conversion action. Id. at 38–39 (Zinter, J.). In a dissenting opinion joined by Justice Konenkamp, Chief Justice Gilbertson argued that an offer to file a criminal complaint to one without authority to act on it had no effect, and thus failed

15

as a "purchaser of farm products" and a "grain dealer," ICI was acting as a financer of C&B Farms during the 2015 crop year. ICI had advanced some funds to C&B Farms and then had required a subordination agreement to advance any further funds to finance C&B Farms' 2015 operations. Although part of ICI's business relationship with C&B Farms was to get grain back from C&B Farms under purchase contracts, ICI was financing C&B Farms and not acting strictly as a purchaser of farm products or grain dealer. ICI when it later purchased farm products from C&B Farms certainly was not "an innocent third-party purchaser," as ICI was fully aware of MetaBank's security interests and MetaBank's right under the May 21 subordination letter to receive $825,784.57 of the proceeds from C&B Farms' 2015 crops before ICI got paid. ICI's business operation as "a grain dealer" does not entitle it to ignore and evade security interests when engaged in financing arrangements with farmers.

Second, the statute itself, in requiring a secured creditor to offer to file a criminal complaint against the debtor before holding entities like "innocent third-party purchases of farm products" responsible, indicates that the statute is meant to apply to situations where debtors are acting criminally. C&B Farms did not act criminally in providing its 2015 crops for sale through ICI. Indeed, if MetaBank had filed some sort of criminal complaint or threatened one against C&B Farms, MetaBank could potentially be liable for malicious prosecution. The statute simply was not meant to apply to the situation presented in this case. Giving the words in the statute "their plain meaning and effect" precludes ICI's interpretation, and thus SDCL § 57A-9-609.1 does not bar MetaBank's conversion claim.

### III. Conclusion

---

the statutory mandate of § 57A-9-609.1. Id. at 48 (Gilbertson, C.J., dissenting). Regardless, Fin-Ag did not involve sales barns acting as a financer of C&M Dairy, the sales barns were unaware of the lender's security interest because of the borrowers' use of an assumed name, the borrowers appeared to act deceitfully, and the sales barns and lender did not have a separate subordination agreement.

For the reasons explained herein, it is hereby

ORDERED that MetaBank's Motion for Summary Judgment, Doc. 23, is granted and summary judgment for MetaBank and against ICI for $480,514.24, plus prejudgment interest,[7] shall enter. It is further

ORDERED that ICI's Motion for Summary Judgment, Doc. 30, is denied. It is finally

ORDERED that MetaBank's Motion to Compel Answers to Discovery Requests, Doc. 45, is denied as moot.

DATED this 21st day of November, 2017.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

---

[7] The pleadings do not make clear a particular date from which prejudgment interest should run, although that should be readily calculable based on when ICI received monies from C&B Farms' 2015 crop sales. The parties are directed to seek to stipulate—without prejudice to ICI's right to appeal from this ruling—as to the date from which prejudgment interest would run or, if they cannot so agree, MetaBank is to file a motion by December 5, 2017, to present that issue to this Court. The Court for now will enter a preliminary summary judgment and expect to enter a final summary judgment by year's end.